FILED
United States Court of Appeals
Tenth Circuit

August 14, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ANTHONY SHIPPLEY, a/k/a Buddy,

      Defendant-Appellant.

No. 11-1076

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:08-CR-00340-REB-3)**

---

Todd E. Mair of Peters, Mair, and Wilcox, Denver, Colorado, for Defendant-Appellant.

Sangita K. Rao, Attorney, Criminal Division, United States Department of Justice, Washington, D.C. (John F. Walsh, United States Attorney, and Pegeen D. Rhyne and Kasandra R. Carleton, Assistant United States Attorneys, District of Colorado; and Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, and Daniel Steven Goodman, Attorney, Criminal Division, United States Department of Justice, Washington, D.C. on the brief) for Plaintiff-Appellee.

---

Before **GORSUCH, ANDERSON,** and **MATHESON**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Anthony Shippley served as the "Sergeant at Arms" for a chapter of the Mongols Motorcycle Club. And the title wasn't ceremonial: his job was to ensure members were armed and ready for confrontations with rival gangs. After a massive nationwide investigation and "take down" of the club in 2008, Mr. Shippley found himself facing a federal drug conspiracy charge. His chief accuser, Benjamine Maestas — a former club president, longtime felon, and sometimes federal informant — testified at trial that Mr. Shippley was responsible for supplying considerable amounts of high quality cocaine for resale to retail customers.

At the end of trial, though, something strange happened. The jury returned a general verdict finding Mr. Shippley guilty of the conspiracy charge. But in response to the court's special interrogatories, the jury indicated that Mr. Shippley had not conspired to distribute *any* of the drugs listed in the indictment. In effect, the jury both convicted *and* acquitted Mr. Shippley of the charged conspiracy.

What to do? In this appeal we wrestle with the question as the district court did before us. For its part, the district court ordered the jury to deliberate further — and those further deliberations quickly yielded an unambiguous guilty verdict. For our part, we cannot say the district court's chosen course was legally impermissible, at least not for the reasons Mr. Shippley offers. In this appeal, we

also address and ultimately reject Mr. Shippley's challenges to a second and separate drug conviction as well as to a sentencing enhancement.

I

But first things first. When instructing the jury on the conspiracy charge (21 U.S.C. § 846), the court explained that it could convict only if it unanimously agreed Mr. Shippley conspired to distribute at least 50 grams of methamphetamine, 500 grams of cocaine, or any amount of ecstacy. The court then gave the jury two documents to fill out: one, a general verdict form (asking the jury to answer guilty or not guilty); the other, a set of special interrogatories (asking which drug kinds and quantities were involved). Before us, no one seeks to contest the propriety of the court's initial instructions or verdict forms. But ultimately those forms did prove a source of confusion: while the jury returned with a guilty verdict on the general verdict form, it answered "no" to each of the special interrogatories, indicating that Mr. Shippley conspired to distribute none of the drugs at issue in the case.

Perplexed, the district court sought advice from counsel and then decided to ask the jury to deliberate again. The court read a supplemental instruction, explaining that "[y]our ostensible verdict of guilty as to the crime of conspiracy as charged in Count One of the Indictment is inherently inconsistent with your answers to the Special Questions." ROA v.1 at 1092. The court indicated that, if the jury wished to render a verdict of not guilty it should reconsider its answer in

- 3 -

the general verdict form. It explained that if the jury wanted to render a guilty verdict it should reconsider its answers to the special interrogatories. The court also made clear that the jury could, if it chose, stand on its existing verdict; that any changes must be unanimous; and that nothing the court said was meant to "intimate or indicate what I think your verdicts or answers should be. Those decisions are entirely up to you." *Id.* Soon after all this, the jury returned with a guilty verdict and an answer to a special interrogatory indicating that Mr. Shippley had conspired to distribute 500 grams or more of cocaine.

Mr. Shippley argues this was error. More precisely, he argues that (a) under the Supreme Court's holdings in *United States v. Powell*, 469 U.S. 57 (1984), and *United States v. Dotterweich*, 320 U.S. 277 (1943), the district court should have entered a verdict of acquittal; and (b) the district court coerced the jury, violating his Fifth Amendment right to due process and his Sixth Amendment right to a jury trial. These, we pause to underscore, are the only arguments he makes and the only ones we address in this opinion. Mr. Shippley does not dispute that the jury's initial verdict was inconsistent, or argue that any provision of the Constitution compelled the district court as a matter of lenity to interpret the initial verdict as an acquittal. Neither does he suggest the court's course in ordering additional deliberations violated the Double Jeopardy Clause of the Fifth Amendment. With enough to do today to address the arguments he does press, we do not pass on those, like these, he does not.

A

Mr. Shippley first insists that *Powell* and *Dotterweich* required the district court to enter an acquittal rather than order the jury to deliberate further. So we must begin by trying to get our hands around those holdings.

In *Powell*, the jury acquitted the defendant of a felony but found him guilty of using a telephone in the commission of that same felony. The district court entered judgment just as the jury's verdict indicated. But before the Supreme Court, the defendant argued that as a matter of issue preclusion and logic the guilty verdict shouldn't be allowed to stand. After all, the defendant said, how could it be that he didn't commit the underlying felony but used a telephone to do just that? The Supreme Court acknowledged that the jury's verdicts were logically at odds but explained that it was "unclear whose ox ha[d] been gored": while it was possible the verdict was a "windfall to the Government at the defendant's expense," it was "equally possible" the jury's inconsistent verdicts benefitted the defendant as a result of mistake, compromise, or lenity. 469 U.S. at 65. And given this, the Court held, the district court was within its rights to allow the jury verdict to stand, inconsistent though it was. *Id.*

*Dotterweich* isn't much different. There, the defendant argued his guilty verdict should be set aside because of an inconsistent verdict against his corporation, even though the evidence against both was much the same. Again, the Supreme Court held as a matter of federal common law that this logical

inconsistency did not preclude the district court from entering the jury's verdict as issued. 320 U.S. at 279.

As comes apparent from stating their holdings, nothing in *Powell* or *Dotterweich* speaks to the propriety of ordering further deliberations in the face of inconsistent verdicts against the same defendant on the same count. In fact, neither opinion speaks to the question of further deliberations at all. Both simply hold the district court was *allowed* to enter a guilty verdict on one count despite a logically inconsistent verdict on another. So how might the opinions help Mr. Shippley in a case where the district court did order further deliberations?

Mr. Shippley invokes an inference. From the fact *Powell* and *Dotterweich* allowed inconsistent verdicts to stand, Mr. Shippley thinks this means they (implicitly) ruled out the possibility of further jury deliberations. Unfortunately, however, neither opinion holds as much. And, unfortunately too, Mr. Shippley doesn't identify what rule of law he thinks might compel such an inference. Maybe he thinks the Double Jeopardy Clause precludes compelling more deliberations after an inconsistent verdict is rendered. Maybe he thinks some other constitutional provision is in play, or perhaps just federal common law. But he does not say.

The closest he comes to supplying an answer is when he points to the Federal Rules of Criminal Procedure. He acknowledges that federal courts in civil cases are permitted by rule to order further deliberations to address an

- 6 -

inconsistency between a general verdict and special interrogatories. *See* Fed. R. Civ. P. 49(b)(3)(B). But, he points out, the criminal rules contain no corresponding provision — and he argues this omission is suggestive — suggestive that the procedure is disfavored in criminal cases. It might be, too, except for the fact the criminal rules contain a catch-all provision in Fed. R. Crim. P. 57(b) expressly addressing what to do when the rules fail to address a question. And this catch-all provision explains that, in the absence of express directions from the rules themselves, judges may "regulate practice in any manner consistent with federal law." So even after resort to the rules it remains incumbent on Mr. Shippley as the appellant to explain why the district court's decision to order further deliberations was inconsistent with federal law, and this he does not attempt to do. That alone is enough to undo his appeal.

But there's another and even larger problem lurking in his logic. Even accepting for argument's sake Mr. Shippley's premise that *Powell* and *Dotterweich* implicitly require (rather than permit, as they hold) a district court to accept a verdict logically inconsistent as between counts or defendants, that still does not speak to our case. In our case, it wasn't just logically incongruous to enter the jury's verdict, it was metaphysically impossible. *Powell* and *Dotterwich* involved logical inconsistencies *between counts* and *between defendants*. However illogical, the verdicts in those cases could be given full effect. This case, by contrast, involves an inconsistency on the *same count with the same*

*defendant* — an inconsistency that simply could not have been given full effect. Something had to give in our case that didn't have to give in these other cases. To enter an acquittal, the district court would have needed to disregard the fact that the jury expressly found Mr. Shippley guilty. To enter a guilty verdict, the court would have needed to overlook the special verdict findings that Mr. Shippley did not conspire to distribute any of the drugs at issue in the case. And nothing in *Powell* or *Dotterwich* speaks either explicitly or implicitly about what a court's to do in these circumstances, let alone suggests the district court committed an error of constitutional magnitude (or otherwise) in proceeding as it did in this case.

If anything, *Powell* might even suggest the opposite conclusion. The Court in *Powell* refused to undo the defendant's conviction on a compound offense despite his acquittal on the underlying felony because it was "unclear whose ox ha[d] been gored": the jury's inconsistent verdict may have favored the government, but it was equally possible it benefitted the defendant. 469 U.S. at 65. That same sort of problem exists here. To enter *any* verdict when the jury first returned, the district court would have had to choose to "gore" one side or the other — just what *Powell* suggests courts should *not* do.

In reply to all this, Mr. Shippley directs our attention to a line of circuit court cases, which he regards as an extension of *Powell*. When a defendant is indicted for participating in a conspiracy to distribute several different drugs and

- 8 -

the jury's guilty verdict fails to indicate which particular drugs the defendant conspired to distribute, these cases hold a sentencing court must base its sentence on the statutory maximum for the drug bearing the least severe punishment. *See, e.g.*, *Morales v. United States*, 635 F.3d 39, 46 (2d Cir. 2011); *United States v. Arnold*, 416 F.3d 349, 357 n.8 (5th Cir. 2005); *see also United States v. McCalister*, 165 F. App'x 599, 606-07 (10th Cir. 2006) (unpublished). Given all this, Mr. Shippley reasons, the district court was required to enter a judgment of acquittal in his case because the jury's initial special verdict form indicated that he had not conspired to distribute *any* amount of drugs.

But this line of reasoning suffers at least one flaw, as well. None of the decisions Mr. Shippley cites addresses whether a district court may ask a jury to deliberate further when the jury's drug quantity findings are unclear or inconsistent. All they hold is that when a jury verdict is ambiguous, the district court cannot later interpret this ambiguity against a defendant at sentencing. They say nothing about what, if anything, a district court can do to *clarify* an ambiguous initial verdict at trial, long before any sentencing occurs.

To be very clear, our rejection of Mr. Shippley's appeal is limited to his effort to analogize to *Powell*, *Dotterwich*, and their putative progeny. We do not purport to address other arguments, possibly emanating from the Double Jeopardy Clause or otherwise, he doesn't raise. Likewise, our holding is limited to the situation before us, where a jury returns a guilty verdict but indicates in its

answers to special interrogatories that the defendant is innocent. We do not hazard a guess what should happen in the opposite situation — when a jury returns a verdict of not guilty but answers special verdict questions indicating that the government has met its burden of proof. In that situation, we can imagine that a defendant might try to argue the jury's verdict *could* be given full effect, reasoning that though the government proved the defendant's guilt, the jury found the defendant not guilty as a matter of lenity. But however that argument might fare, it isn't available here because it's difficult to see how a jury might have been lenient to the defendant by finding Mr. Shippley guilty despite its conclusion that the government had failed to prove the facts necessary to support such a verdict. Neither, in any event, does Mr. Shippley attempt to try to argue otherwise.

B

Beyond analogizing to *Powell* and *Dotterwich*, Mr. Shippley suggests the district court's order requiring further deliberations unlawfully coerced the jury in violation of his Fifth Amendment right to due process of law and his Sixth Amendment right to trial by jury. In support, he directs our attention to *Jenkins v. United States*, 380 U.S. 445 (1965) (per curiam), where the Supreme Court held that a judge unconstitutionally coerced a jury by telling it "You have got to reach a decision in this case." *Id.* at 446.

- 10 -

The trouble is, the district court's supplemental instruction here can't be fairly compared to a *Jenkins* charge. While it's true the district court told the jury that its "ostensible verdict" of guilty was "inherently inconsistent" with the special verdict findings, and while one can argue whether the jury might have taken this language in isolation as a criticism and perhaps even coercive, the court didn't stop there. It proceeded to emphasize that the jury was free to retain its existing verdicts if it wished. ROA v.1 at 1092. And the district court expressly added that it did not intend to "intimate or indicate what I think your verdicts or answers should be. Those decisions are entirely up to you." *Id*. Viewed in whole, this instruction was nothing like a *Jenkins* charge and Mr. Shippley identifies no authority holding instructions comparable to those issued in this case unconstitutionally coercive.

Now, Mr. Shippley's brief might be read as making a different but related argument. It might be read as suggesting that the mere act of asking the jury to deliberate further, however nicely put, is *inherently* coercive after the jury has reached a definitive if inconsistent verdict. But Mr. Shippley cites no authorities and supplies no reasoning to support such an argument. And certainly his bare assertion of a constitutional violation, without authorities or developed argument, is insufficient to warrant reversal of his conviction. *See* Fed. R. App. P. 28(a)(9)(A) (the appellant's brief must contain "appellant's contentions *and the*

*reasons for them*, *with citations to* [ ] *authorities*" (emphasis added)); *United States v. Fishman*, 645 F.3d 1175, 1194 (10th Cir. 2011).

II

Beyond the larger drug conspiracy charge, Mr. Shippley was indicted for and convicted of a second crime — using a "communication facility" (a telephone) to facilitate an illegal sale of Percocet pills to Mr. Maestas for his personal use. *See* 21 U.S.C. § 843(b). On appeal, Mr. Shippley contests one of the district court's evidentiary rulings related to this charge: in his view, it was error to allow Mr. Maestas to testify that Mr. Shippley sold him Percocet pills on at least twenty prior occasions separate and apart from the sale charged in the indictment. The district court allowed this testimony as both "intrinsic" to the charged offense, and as admissible prior act evidence under Fed. R. Evid. 404(b). Before us, Mr. Shippley and the government fiercely debate both theories of admissibility, as well as whether the evidence's admission was harmless under Fed. R. Crim. P. 52. In our view, the government is correct on at least one of these scores — the district court did not commit reversible error in allowing Mr. Maestas's testimony under Rule 404(b).

"To determine if the admission of Rule 404(b) evidence was proper, we apply a four-part test which requires that: (1) the evidence was offered for a proper purpose under Fed. R. Evid. 404(b); (2) the evidence was relevant under Fed. R. Evid. 401; (3) the probative value of the evidence was not substantially

outweighed by its potential for unfair prejudice under Fed. R. Evid. 403; and (4) the district court, upon request, instructed the jury to consider the evidence only for the purpose for which it was admitted." *United States v. Wilson*, 107 F.3d 774, 782 (10th Cir. 1997) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). We review the district court's application of this test for an abuse of discretion and will not reverse unless its ruling falls outside "the bounds of permissible choice in the circumstances." *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006) (quotation omitted).

On the first prong, the district court correctly observed that Mr. Maestas's testimony wasn't offered to show Mr. Shippley's propensity to commit a crime but instead to explain the meaning of a phrase used by Mr. Shippley. Fed. R. Evid. 404(b). As evidence that Mr. Shippley used a "communication facility" or telephone to facilitate illegal sales of Percocet to Mr. Maestas, the government played audio tapes of telephone calls between the pair. In one call, Mr. Shippley told Mr. Maestas "that girl called me for them things that you get all the time," and the two men then discussed the quantity and price of the "things." ROA v.3 at 437. Mr. Maestas's testimony that Mr. Shippley sold him Percocet on twenty prior occasions was offered to show simply that during the call at issue in the case the phrase "them things that you get all the time" referred to drugs, not something else.

In response, Mr. Shippley cites *United States v. Edwards*, 540 F.3d 1156 (10th Cir. 2008), where we held evidence of prior drug possession inadmissible under Rule 404(b) because the defendant "never asserted that he was unaware of the nature of the substances at issue but simply argued that he was not personally involved in the distribution or possession for distribution of these substances." *Id*. at 1163. The upshot of all this, Mr. Shippley says, is that Rule 404(b) permits evidence of prior drug offenses only when a defendant claims he is unaware of the nature of a substance.

This overreads *Edwards*. The passage on which Mr. Shippley relies only seeks to explain why lack of mistake was not an issue in *that* particular case, not to set down an unyielding rule about Rule 404(b) evidence for *all* drug cases, no matter their variation. Besides, the nature of the substance Mr. Shippley spoke of when referring to "them things that you get all the time" *was* an issue in this case. By arguing he did not use a telephone to facilitate a drug sale, Mr. Shippley necessarily contested the government's argument that he was referring to Percocet pills when he used this phrase. Accordingly, evidence about the nature of the "things" Mr. Maestas purchased all the time was at issue and thus permissible even under Mr. Shippley's reading of *Edwards*.

Moving to step two of the analysis, the district court correctly determined that Mr. Maestas's testimony was relevant under Rule 401. By supporting the government's theory that Mr. Shippley was referring to Percocet pills during a

- 14 -

phone call at issue in the indictment, Mr. Maestas's testimony about prior drug sales helped to prove that Mr. Shippley used a telephone to facilitate drug trafficking. Mr. Shippley disputes this, arguing that drug activity on an isolated basis long in the past is categorically irrelevant to the current charges. *See Wilson*, 107 F.3d at 785 ("[P]rior narcotics involvement is relevant when that conduct is close in time, highly probative, and similar to the activity with which the defendant is charged." (quotation omitted)). But whatever other problems may exist with this argument, there's simply no indication in this record that the parties' drug exchanges were isolated and long ago. To the contrary, Mr. Maestas spoke of at least twenty different sales. And Mr. Maestas testified he was only addicted to Percocet in the five years prior to his arrest in connection with the 2008 "take down" of the motorcycle gang, so the sales must have occurred during this time. ROA v.3 at 434. In these circumstances, we cannot say the district court's relevancy determination amounts to an abuse of discretion.

Neither, at the third step of the analysis, do we see any reversible error in the district court's Rule 403 assessment. While Mr. Shippley is certainly correct that Mr. Maestas's testimony about the twenty prior Percocet sales was prejudicial, the district court concluded that the risk of unfair prejudice did not "substantially outweigh[]" the probative value of the testimony. Fed. R. Evid. 403. We agree. The jury had already heard testimony that Mr. Shippley was involved in other drug-trafficking activities, so Mr. Maestas's testimony was not

as prejudicial as it might have been if offered against a defendant with no other drug involvement. And the testimony was highly probative — it went to the heart of the government's case, showing that Mr. Shippley used a "communications facility" to facilitate a drug transaction when he called Mr. Maestas and offered to sell "them things that you get all the time."

Finally, the district court expressly indicated that it was willing to give a limiting instruction upon request. ROA v.3 at 302. Although no instruction was given in the end, this is only because Mr. Shippley never requested one. And "it is not error for a trial court to fail to [issue a limiting instruction] in the absence of a proper request by counsel." *United States v. Record*, 873 F.2d 1363, 1376 (10th Cir. 1989).

In light of all these factors, we conclude that the district court did not abuse its discretion in allowing Mr. Maestas's testimony under Rule 404(b) and so we need not (and do not) address the government's other arguments for affirming the district court.

III

Mr. Shippley's final argument concerns the application of a sentencing enhancement. At sentencing, the district court cited and relied on U.S.S.G. § 2D1.1(b)(1), an enhancement applicable to defendants who possess a dangerous weapon during a drug trafficking offense. Mr. Shippley argues that this was error.

The difficulty is, Leonard Martinez, the secretary and treasurer of the motorcycle club and a co-conspirator in the drug trafficking operations, testified at trial that Mr. Shippley gave him a chrome pistol for his protection. ROA v.3 at 859. And the district court found this happened during the course of the conspiracy. Supp. ROA v.5 at 37-38. If that finding stands, it is legally sufficient to sustain the enhancement. It is because the government's initial burden in seeking a § 2D1.1(b)(1) enhancement is simply to prove, by a preponderance of the evidence, that the gun in question was "present" or "possessed" either during the charged offense or during other drug trafficking activity that was "part of the same course of conduct or common scheme or plan as the offense of conviction." *See United States v. Foy*, 641 F.3d 455, 470 (10th Cir. 2011) (quotation omitted); *United States v. Roederer*, 11 F.3d 973, 982 (10th Cir. 1993) (discussing U.S.S.G. § 1B1.3's definition of relevant conduct). Once the government proves that much, the burden shifts to the defendant to show that it is "clearly improbable that the weapon was connected with the offense." *Foy*, 641 F.3d at 470. And in his appeal Mr. Shippley doesn't even attempt to carry this burden.

Because the district court's factual finding is itself legally sufficient to support a § 2D1.1(b)(1) enhancement in this case, we may reverse only if the finding is itself clearly erroneous. *See United States v. Beltran*, 571 F.3d 1013, 1020 (10th Cir. 2009). And that's a high standard to meet. A finding is clearly

- 17 -

erroneous "only if [it] is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *United States v. Mullins*, 613 F.3d 1273, 1292 (10th Cir. 2010) (quotation omitted). It is not enough that the finding is "possibly or even probably wrong; the error must be pellucid to any objective observer." *Id.* (quotation omitted).

Neither can we say that much in this case. Mr. Maestas testified that Mr. Shippley's duties as "Sergeant at Arms" included providing guns and ammunition for club members, most if not all of whom were involved in the drug conspiracy. ROA v.3 at 527. For his part, Mr. Martinez testified that he received a gun from Mr. Shippley, whom he met only after joining the Mongols Motorcycle Club sometime in 2003. ROA v.3 at 848. We know too that Mr. Martinez was taken into custody in May of 2008, *id.* at 846, so Mr. Shippley must have given Mr. Martinez the gun sometime in this approximately five year period. Mr. Shippley objects that the charged conspiracy only lasted from August 2006 to October 2008, so it is just as (if not more) likely that the gun transfer occurred sometime before this. But the district court's finding that Mr. Shippley gave Mr. Martinez a gun during the drug trafficking conspiracy wasn't limited to the *charged* conspiracy: the court was free to find that the drug trafficking conspiracy began well before August 2006. *See Roederer*, 11 F.3d at 982 (a § 2D1.1(b)(1) enhancement applies if a dangerous weapon was present or possessed during

uncharged drug trafficking activity that constitutes relevant conduct under § 1B1.3); *see also United States v. Rodriguez-Felix*, 450 F.3d 1117, 1131 (10th Cir. 2006) (*United States v. Booker*, 543 U.S. 220 (2005), does not prohibit sentencing courts from considering uncharged relevant conduct in calculating a defendant's sentencing guidelines range). And evidence at trial suggested as much. Mr. Maestas testified that he had been receiving drugs from California members of the motorcycle club for several years before 2006. ROA v.3 at 539. And Mr. Martinez testified that by the time the charged conspiracy began in August 2006, he was already spending 70 percent of his free time, about 4 hours a day, working for Mr. Maestas's drug operations. ROA v.3 at 839.

Assembled together, these facts are enough to permit a rational person to conclude, by a preponderance of the evidence, that the gun Mr. Shippley gave to Mr. Martinez was present or possessed during the drug trafficking conspiracy. The conclusion may not be unavoidable. It may not be the same conclusion another factfinder would reach on the same record. But it is not *clearly* wrong. And in our legal order where so much deference is due the factfinder who sees and hears the witnesses, that is the only question we as appellate judges, with but a written record in hand, are authorized to ask and answer.

Affirmed.